In re Larry CUMMINS.

Thomas E. HAYS, Jr.; Larry Cummins Chevrolet, Inc.; Cummins Chevrolet & Geo, Inc.; and Coke Chevrolet Company, Plaintiffs,

v.

Larry CUMMINS, Defendant.

Larry CUMMINS, Counterclaimant,

v.

Thomas E. HAYS, Jr.; Larry Cummins Chevrolet, Inc.; Cummins Chevrolet & Geo, Inc.; and Coke Chevrolet Company, Counterclaim Defendants.

Bankruptcy No. 91–16453 S.
Adv. No. 92–6508.

United States Bankruptcy Court,
W.D. Arkansas,
Hot Springs Division.

March 15, 1994.

C. Richard Crockett, Little Rock, AR.

William Waddell, Little Rock, AR.

*AMENDED FINDINGS OF FACT AND
CONCLUSIONS OF LAW*

MARY D. SCOTT, Bankruptcy Judge.

This cause came before the Court upon the trial of the complaint to determine dischargeability and objection to discharge, a core proceeding. The non-core causes of action set forth in the amended counterclaim were also tried to the Court. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a), 1334. Moreover, this Court concludes that the causes alleged in the complaint are "core proceedings" within the meaning of 28 U.S.C. § 157(b) as exemplified by 28 U.S.C. § 157(b)(2)(I), (J). However, the causes stated in the Counterclaim

are not core proceedings such that the Court will enter separate proposed findings for transmission to the district court.

## I.

### NATURE OF THE PROCEEDING

From 1989 through 1991, Larry Cummins ("Cummins") and Thomas E. Hays, Jr. ("Hays") entered into various agreements whereby they purchased three automobile dealerships. Cummins was a forty-nine percent (49%) owner, president and general manager of the dealerships. Disputes arose between the parties such that in August 1991, Cummins was removed as manager of the dealerships. Cummins filed a Chapter 7 bankruptcy petition on November 12, 1991. On March 11, 1992, Hays and the dealerships filed an adversary proceeding objecting to the debtor's discharge and objecting to dischargeability of various debts. Cummins filed a counterclaim and an amended counterclaim stating causes of action sounding in breach of contract and tortious interference with a contractual relationship. The case was subsequently converted to a case under Chapter 11 of the Bankruptcy Code.

The complaint states causes of action under Bankruptcy Code sections 523(a)(2), (4), (6), and sections 727(a)(2), (3), (4), (5), (6). The amended counterclaim asserts causes of action against the three dealerships sounding in breach of contract, specifically, breach of employment agreements, and a cause against Hays, individually, for tortious interference with the employment contracts. The amended counterclaim alleges that Hays induced the dealerships to breach their contracts by failing to vote stock in a certain way and failing to provide an infusion of capital.

## II.

### FACTS

In late 1988 or early 1989, both Cummins and Hays were seeking to purchase a car dealership. Cummins had worked in the car industry his entire career and wanted to manage a dealership, preferably his own.

Hays sought to purchase a dealership in which his son, John Hays could be trained and, eventually, become the manager. Cummins and Hays were introduced to each other by the owner of Young Chevrolet, Inc., who wished to sell his dealership in Hope, Arkansas.

### A. The Hope Dealership

On March 14, 1989, Hays and Cummins entered into an Agreement to Purchase pursuant to which Hays and Cummins agreed to acquire all of the issued and outstanding common stock of Young Chevrolet Company, Inc. Hays and Cummins also entered into an Offer and Acceptance with the shareholders of Young Chevrolet Company under which they agreed to purchase the stock and all of the real property on which Young Chevrolet conducted business. Under these agreements, Hays and Cummins paid the shareholders of Young Chevrolet $100,000 in cash. In addition, Hays, Cummins, and the dealership [1] executed and delivered to the sellers promissory notes in the amount of $300,000. Hays and Cummins contributed $100,000 in cash to the dealership as additional working capital. Hays purchased 255 shares constituting fifty-one percent (51%) of the shares; Cummins purchased 245 shares, constituting 49 percent of the stock of the Hope Dealership.

All of the cash in this transaction was contributed by Hays from the proceeds of a loan from Worthen Bank. In exchange for Hays' cash contributions on behalf of Cummins, Cummins and his then wife, Glenda Cummins, executed and delivered to Hays a secured promissory note in the principal amount of $98,000. The note was secured by Cummins 245 shares of stock in the Hope Dealership.

The agreement also provided that the Hope Dealership would enter into a management contract with Cummins under which he would be the exclusive manager of the Hope Dealership for five years at a salary of $75,000 per year. No management contract was ever signed. There was no evidence that Cummins, the president and general manag-

---

1. The name of Young Chevrolet Company, Inc. was changed to Larry Cummins Chevrolet, Inc. It will be referred to in this opinion as the "Hope Dealership."

er of the Hope Dealership, ever caused such an agreement to be prepared or signed. The agreement also provided that Cummins could be terminated upon an accountant's certification that the dealership was unprofitable and failed to generate sufficient operating income to pay expenses together with debt service. Thus, Cummins had a motive to ensure that the dealership appeared profitable.

Cummins was elected president and general manager of the Hope Dealership. Hays, Cummins, and Glenda Cummins were elected directors. The Hope Dealership's name was changed from Young Chevrolet Company to Larry Cummins Chevrolet, Inc.

Pursuant to General Motors' requirements, each month, Cummins and Barbara Ingram,[2] the dealership's bookkeeper, prepared the data for a monthly operating report which was transmitted by modem to General Motors.[3] In addition, each month, a copy of this operating report was given to Hays. Hays was unfamiliar with the format of the operating reports and several times had Cummins go over the reports with him.

The preparation of the operating reports is of particular interest and import in this case. Ingram testified that if General Motors received a report which showed a low cash balance or low amounts of working capital, General Motors would call, ask for explanations, and require an infusion of working capital. In order to avoid such procedures, each month, Ingram, with Cummins' knowledge, assistance, and under his direction would arbitrarily add to the working capital on the ledgers of the dealership. To offset this addition, she would arbitrarily debit another account, often the used car inventory account. Five days after the report was sent, she would reverse these debits and credits on the books.[4] For example, In December 1989, Ingram posted a $55,107.38 debit to the cash account of the Hope Dealership, which was reversed in early January of 1990 after the printing of the December 31, 1989, General Motors Operating Report. This bogus entry caused the Hope Dealership's December 31, 1989, operating report to overstate cash by $55,107.38. In January of 1990, Ingram posted a $120,000 debit to the Hope Dealership's cash account, which was reversed in early February of 1990 after the printing of the January 31, 1990, operating report. This bogus entry caused the Hope Dealership's January 31, 1990, operating report to overstate cash by $120,000.

The sole purpose of these false entries was to overstate the cash of the dealership and misrepresent to Hays and General Motors

2. In April 1991, Glenda Cummins filed marital dissolution proceedings against Larry Cummins. After Larry and Glenda Cummins divorced, and during the pendency of this bankruptcy case, Larry Cummins married Barbara Ingram. Although at the time of the trial in this adversary proceeding, August 1993, Ms. Ingram used the name Barbara Ingram Cummins, this opinion will refer to her as Ingram.

3. Cummins assertion that, since the reports were actually generated on paper by GM, he did not actually "prepare" the operating reports, is nonsense. He intentionally placed false information into the dealerships' computers for retrieval by GM. Further, he caused the bogus reports to be given to Hays.

4. Ingram testified to this freely and candidly. See Tr. 511–514. Indeed, she saw nothing wrong with the amendments she made to the books:

A: Well, these were—Larry asked me to make adjusting entries, and he conveyed to me that he did not want to send a minus balance in to General Motors and the bank, which was practical to me. I couldn't see any sense in show-

ing a negative balance. You send a negative balance in to General Motors, they're just going to turn around and ask you to put $200,000 in.
* * *
A. I would say that when I transmitted a financial statement to General Motors it was as accurate as it could be.
Q. And that includes the cash adjustments that we've discussed?
A. That's right.
Q. And that's even though you would immediately reverse those once you transmitted that data? That's your position?
A. Right.
Tr. 514, 519.
Both Ingram and Cummins attempted to explain this procedure by the fact that there were assets coming into the dealership, not yet credited, such that it was appropriate to adjust the entries. For example, Ingram testified that there were cars sold for which they had not yet received the money. These were the additions purportedly made to the cash account. However, when questioned closely, it was clear that the amount of anticipated funds from the sales failed to correlate to the figures added.

the cash position of the Hope Dealership. Both Cummins and Ingram knew that both entities relied on these reports in their transactions.

Neither Ingram nor Cummins ever advised Hays that the information he received monthly on the operating reports was false. Amazingly, while both Cummins and Ingram freely admitted to this practice, they bristled at the characterization of the alterations as false or bogus. This dichotomy goes to the heart of the dispute in this case: although the evidence of fraud is uncontroverted, neither Cummins nor Ingram perceive the true nature of their acts.

Another manner in which Cummins and Ingram inflated numbers on the operating reports was to charge losses on the sale of used cars and certain expenses to selected used car accounts. For example, on September 30, 1989, Ingram charged a $6,393 loss on the sale of a used car, inventoried as stock number "P008," to a 1984 Chevrolet Caprice, which was inventoried as stock number R007. This entry caused the value of the 1984 Chevrolet Caprice to be overstated in the books and records and on the financial statements of the Hope Dealership by at least $6,393 and the loss on the sale of P008 to be deferred indefinitely. From September 15, 1989 through May 31, 1991, there were thirty-two "adjusting" entries to the 1984 Chevrolet Caprice account such that in May of 1991, the 1984 Chevrolet Caprice was carried on the books at $17,473.29, an amount greatly exceeding its real value. Similar entries were made for other vehicles, including stock number R–19, a 1987 Chevrolet Caprice, causing the Caprice to be valued, as of August 1, 1991, in excess of $44,000. In this manner, Cummins and Ingram overstated the income and used car inventory. Neither Cummins nor Ingram had a credible explanation for such charges. They simply asserted that since the used cars were "written down" at the end of the year for tax purposes, there was no harm.

In February 1989, just prior to the acquisition of the Hope Dealership by Cummins and Hays, the records of the Dealership indicated the following financial condition:

| | | |
|---|---|---|
| losses of | $ | 27,876 |
| a negative net worth of | $ | 33,529 |
| total assets | $ | 730,561 |
| total cash/contracts in transit | $ | 66,670 |

In December 31, 1989, the operating reports showed

| | | |
|---|---|---|
| year-to-date net profits of | $ | 13,945 |
| total net worth | $ | 41,292 |
| total assets | $ | 1,883,234 |
| total cash/contracts in transit | $ | 203,053 |

Further, the Hope Dealership had refunded $109,948 to Hays and Cummins in August of 1989. The December 31, 1990, operating report for the Hope Dealership shows the following:

| | | |
|---|---|---|
| year-to-date net income | $ | 225,930 |
| total net worth | $ | 253,664 |
| total assets | $ | 1,723,136 |
| total cash/contracts in transit | $ | 62,622 |

The Hope Dealership refunded an additional $105,345 to Hays and Cummins in February 1990. The July 31, 1991, operating report for the Hope Dealership showed the following:

| | | |
|---|---|---|
| year-to-date net income | $ | 50,496 |
| total net worth | $ | 504,328 |
| total assets | $ | 2,053,913 |
| total cash/contracts in transit | $ | 132,256 |

In contrast, when the books and records were audited, the August 31, 1991, balance sheet indicated:

| | | |
|---|---|---|
| negative net worth of | $ | 152,457 |
| total assets | $ | 1,510,993 |

### B. The Malvern Dealership

On November 10, 1989, Hays and Cummins entered into another Agreement to Purchase. Purchasing the stock of Padgett Chevrolet Olds, Inc.,[5] located in Malvern, Arkansas, the parties' Agreement to Purchase the Malvern Dealership and related transactions were substantially similar to the Hope Dealership agreement and transactions. Hays borrowed $200,000 from Worthen Bank, contributing cash on behalf of Cummins; Cummins and his wife executed a promissory note payable to Hays in the amount of $98,000, secured by Cummins' interest in the dealership. Cummins was elected president and general manager of the

---

5. The name of this dealership was changed to Cummins Chevrolet & Geo, Inc., but will be referred to in this opinion as the Malvern Dealership.

dealership, as well as a director. One important distinction in this Agreement to Purchase was that Cummins was to receive no salary for his duties operating the Malvern Dealership. The transaction on the Malvern Dealership did not close until March 1990 due to problems arising with the sellers.

The evidence was uncontroverted that Cummins and Ingram continued their practice of falsifying the books and operating reports submitted to General Motors and Hays. In the same manner as described regarding the Hope Dealership's books and reports, "alterations" were made to the books and later reversed after the false operating reports were circulated. The false reports generated an operating report for June 30, 1991, showing year-to-date net income in excess of $27,000, a total net worth of $37,313, total assets of $1,549,965, and total cash and contracts in transit of $120,038. In contrast, the August 31, 1991, balance sheet prepared by the accountants, after audit, showed a retained deficit of $964,766, a negative net worth of $745,771, total assets of $1,436,565, and cash and contracts in transit of $25,677. The difference in net worth is nearly $800,-000.

### C. *The Jefferson Dealership*

On January 18, 1991, Hays and Cummins entered into a third Agreement to Purchase, buying the stock of Coke Chevrolet Company, located in Jefferson, Texas.[6] Hays contributed $350,000 to an account of the Hope Dealership, $100,000 of which was used to purchase the stock of the Jefferson Dealership, $150,000 of which was contributed to the Jefferson Dealership as additional working capital, and $100,000 of which was distributed to the Malvern Dealership as additional working capital. $171,500 of the funds contributed by Hays were for the benefit of Cummins. Accordingly, Cummins and his wife signed a secured promissory note dated January 18, 1991, in the amount of $171,500 to Hays. The promissory note was secured by all of Cummins' stock in the Hope, Malvern, and Jefferson Dealerships.[7] At this time, the $171,500 note was Cummins' only indebtedness to Hays because all prior notes had been paid in full.

The Agreement to Purchase contained language under which the parties' agreed that the Jefferson Dealership would enter into an employment contract with Cummins, but that Cummins would receive no salary from the Jefferson Dealership. Again, no management contract was ever signed. There was no evidence that Cummins, the president and general manager of the Jefferson Dealership, ever caused such an agreement to be prepared or signed. The agreement also provided that Cummins could be terminated upon an accountant's certification that the dealership was unprofitable and failed to generate sufficient operating income to pay expenses together with debt service. Again, Cummins had a motive to ensure that the dealership appeared profitable. Cummins was elected president and general manager of the dealership, as well as a director.

### D. *J & J Advertising Agency*

Beginning as early as January 1990, Cummins managed all of the Dealerships' newspaper, television and radio advertising through a personally controlled sole-proprietorship named J & J Advertising Agency ("J & J"). The purpose of the business was to allow the Dealerships to contract for advertising services at discounts. However, because of the way in which Cummins managed J & J's contracts, billings to the Dealerships, and monies received and disbursed by J & J, the Dealerships suffered losses, and

---

6. It was contemplated that the name of this dealership would be changed to Larry Cummins Chevrolet–Geo of Jefferson, Texas. It will be referred to in this opinion as the Jefferson Dealership.

7. Cummins asserts that plaintiffs' Exhibit 30 is not the document he signed. Specifically he asserts that only his stock in the Jefferson Dealership was pledged on this note. The Court finds that plaintiffs' Exhibit 30 is the note signed by

Cummins. This decision is based upon the testimony and demeanor of the witnesses, including Cummins and James Pilkington, and on the fact that the amount contributed related to each of the three dealerships, not merely the Jefferson Dealership. Unlike the previous transactions, the cash Hays contributed was not used solely to purchase the stock of one dealership, but was funneled to or through the Hope and Malvern Dealerships as well.

the GM operating reports understated advertising expenses and liability.

Cummins failed to keep or maintain adequate records of the operations and activities of J & J. The only records Cummins produced were bank statements and some invoices from advertising vendors. Because of the absence of adequate books and records, the Dealerships have been unable to ascertain and evaluate J & J's transactions.

In addition, there is evidence of self-dealing to the detriment of the dealership corporations. For example, plaintiffs' exhibit No. 126 shows that J & J paid $3,123.04 to Cummins or creditors of Cummins. (See also No. 127–129.) Exhibit No. 130 reflects that Cummins deposited $2,000 in checks from Good Times Van Company into his own account which should have been deposited into J & J's account or the Malvern Dealership's account. There was no evidence that Cummins was entitled to receive those funds. Further, the amount of advertising services and the amounts billed to the dealerships for these services do not correlate: the billings by J & J exceed the invoiced advertising by more than $30,000. It is unclear, because of the inadequate records, whether J & J spent the money on actual advertising expense or whether the funds were pocketed by Cummins. In addition to being overbilled $30,000, the Dealerships, after Cummins was terminated, were ultimately forced to pay in excess of $23,000 to advertising vendors who had not been paid by J & J. As a result of J & J's failure to make these payments, the financial statements of the Dealerships understated the advertising expenses and liability by at least $23,000.

E. *Breaches of the Franchise Agreements*

In December 1990, Cummins reported on behalf of the Hope Dealership nineteen false automobile sales to General Motors Corporation for the purpose of obtaining moneys under a GM incentive program. The reports falsely stated that sales were made to employees of the Hope Dealership and fictitious persons. Such action was not only unlawful,

it constituted a breach of the Hope Dealership's franchise agreement with General Motors Corporation. This breach could have resulted in termination of the franchise.

From June 15, 1992, through June 18, 1992, representatives of GM conducted an audit of the Malvern Dealership, after which GM determined that thirty-one false transactions under GM and GMAC incentive programs occurred during 1990 and 1991. As a result, in July 1992, the Malvern Dealership and Hays paid $28,324.95 to GM to reimburse General Motors for payments that had been received by the Malvern Dealership due to the fraudulent transactions and reports submitted by Cummins.

F. *Other Practices*

1. *Pat High.* In January 1990, Pat High of Hot Springs, Arkansas, remodeled a bedroom suite at Cummins' home at # 3 Legend Lane, Hot Springs, Arkansas, in exchange for a $3,500 credit toward the purchase of a new 1989 Silverado truck from the Hope Dealership. Since neither the Board of Directors nor Hays approved the credit to High, the credit constituted unauthorized compensation to Cummins.

2. *Non-existent Vehicles.* On August 24, 1991, the Malvern National Bank inspected the Malvern Dealership to verify the existence of automobiles that had been floor-planned[8] by the Malvern Dealership with Malvern National Bank. The bank discovered that $91,125 worth of cars had been sold out of trust or did not exist. For example, Cummins floor-planned a 1990 Lincoln for $17,800, which the Malvern Dealership never owned nor had in its possession. As a result of cars sold out of trust, and losses on defaulted recourse consumer contracts, Hays paid to the Malvern National Bank $367,588.64 in September and October 1991.

3. *Sales to Unqualified Purchasers.* Cummins regularly and consistently approved the sales of automobiles to customers who lacked the financial ability to fund the purchase. As of August 31, 1991, twenty

---

8. A floor plan is a method of financing the automobiles. Under a floor plan, a lending institution provides financing for inventory of vehicles and holds a chattel mortgage on each vehicle. When the car dealer sells the car, the institution is paid. *See generally Snuffy Smith Motors, Inc. v. Universal C.I.T. Credit Corp.*, 236 Ark. 954, 370 S.W.2d 808, 809 (1963).

percent of the contracts held by Malvern National Bank were thirty days or more past due. Cummins sold, authorized and approved the sale of automobiles on a recourse basis in complete disregard of the financial means of the purchasers. The August 31, 1991, balance sheet of the Malvern Dealership states that the Malvern Dealership was contingently liable on $5,200,000 of outstanding recourse consumer contracts sold to Malvern National Bank and Arkansas Bank & Trust. Subsequent to that date, the Malvern Dealership and Hays suffered losses of over $200,000 on the outstanding recourse consumer contracts.

4. *The Ronnie Diamond Transactions.* Beginning as early as June 15, 1990, Cummins implemented fraudulent schemes to obtain use of funds for the Hope Dealership and dealerships in Dallas, Texas, controlled by a friend, Ronnie Diamond. Diamond controlled several entities that engaged in the practice of "drafting on" the Hope Dealership for the purpose of creating "float"[9] and obtaining short term financing.

An envelope draft looks like a check, and is used by persons in the wholesale and retail automobile industry to transfer titles to automobiles. The envelope is sealed and generally contains a title instrument, a billing invoice, an odometer statement, and other documents as may be necessary to transfer title from a seller to a buyer. The face of the envelope includes the make, model, and Vehicle Identification Number ("VIN number") of the automobile being sold, the name of the payee or seller, the name of the payor or buyer, the name of the collecting bank (the seller's bank, which receives the draft for deposit and transmittal to the presenting bank) and the name of the presenting bank (the buyer's bank, which receives the draft from the seller's bank for delivery to and payment by the buyer). Upon receipt of a draft for deposit, the collecting bank sends the draft to the presenting bank. In some cases banks give immediate credit on drafts deposited for collection. In this case, First National Bank of Hope gave immediate credit to the Hope Dealership on drafts deposited for collection.

When the presenting bank receives a draft from a collecting bank, it must promptly notify the buyer that it has received the draft. The buyer must pay for the draft within the time set forth on the draft instrument. If the buyer fails to pay for the draft within the time prescribed on the draft, the presenting bank must give notice of dishonor to the transferor of the draft (the collecting bank). If the presenting bank fails to give notice of dishonor or sends collected funds to the transferor of the draft within the time set forth on the draft, the presenting bank must pay for the draft. In other words, if a presenting bank fails to give the transferor of the draft timely notice of dishonor, the transferor of the draft may have a cause of action against the presenting bank for the full amount of the draft. The presenting bank must then look to the buyer, or the property represented by the draft, for repayment.

Beginning in June of 1990, Ronnie Diamond deposited drafts with his banks to be purchased by the Hope Dealership. Soon after the Hope Dealership purchased a Diamond draft, it would create a new draft to be purchased by a Diamond affiliate in an amount that was generally $105 greater than the Diamond draft it had just purchased. The Hope Dealership would deposit the new draft at First National Bank of Hope for transfer to one of Diamond's banks in Texas. Because the First National Bank of Hope gave the Hope Dealership immediate credit on the deposit, the Hope Dealership was out of funds for only a very short period of time. In addition, the Hope Dealership (or Cummins) earned up to $105 on each of the transactions.

The transactions regarding the 1990 Lincoln, mentioned above, exemplifies this scheme. On July 27, 1990, the Hope Dealership purchased a Diamond draft on the 1990 Lincoln for $23,500. The Hope Dealership resold the draft to Satellite Management, a Diamond affiliate, on July 27, 1990, for $26,600. The Lincoln was again purchased by

---

**9.** A "float" is simply the delay created by the collection of funds by one bank from another.

*United States v. Stone,* 954 F.2d 1187, 1188 n. 1 (6th Cir.1992).

the Hope Dealership in September 1990 and resold to Diamond Motors for $19,605 on October 10, 1990. The Hope Dealership's redraft to Diamond Motors was sent by First National Bank of Hope to Diamond Motors' bank, Northwest Bank on October 12, 1990. On January 11, 1991, the Lincoln was again purchased by the Hope Dealership for $17,500, and resold to Satellite Management on January 23, 1991, for $17,605. The exhibits also include a automobile deal jacket, dated March 1, 1991, for the same Lincoln. That jacket contains the January 23, 1991, draft from the Hope Dealership to E & M Auto Sales, another Diamond affiliate. The new deal jacket was created because E & M Auto Sales failed to pay for the January 23, 1991, draft delivered by First National Bank of Hope to E & M Auto Sales' bank. Additional purchases and repurchases of this Lincoln were made until June 27, 1991, when the draft to Diamond Motors was returned unpaid. The end result of these transactions is that the Hope Dealership paid Diamond Motors $17,500 for the title documents to a 1990 Lincoln which was never repurchased by Diamond or one of his affiliates. None of the plaintiff affiliates ever had possession of the Lincoln, Diamond has refused to reimburse the Dealerships for the loss or inform the Dealership as to the Lincoln's whereabouts. This automobile was also floor-planned through Malvern National Bank.

5. *Other Floats.* As early as November 1989, Cummins implemented a scheme involving checks and envelope drafts in order to inflate the dealerships' cash account balances at the First National Bank of Hope, Malvern National Bank and First National Bank of Jefferson. Cummins, and other employees acting on Cummins' instructions, signed blank checks drawn on the dealerships' bank accounts. These blank checks

were in the possession of all of the dealerships, so that if one dealership needed cash, it could obtain it by depositing in its own account one of the other dealerships' checks. For example, if the Malvern Dealership needed cash, it would complete a blank Hope Dealership check and deposit it in the Malvern Dealership's account at Malvern National Bank.

Cummins also implemented a scheme for the creation of float using vehicle drafts. If the Hope Dealership needed cash, Cummins would direct an employee to deposit drafts at First National Bank of Hope for purchase by the Malvern Dealership. First National Bank of Hope would give the Hope Dealership immediate credit on the drafts and would send the drafts to Malvern National Bank for presentment to the Malvern Dealership. The Malvern Dealership would purchase the drafts with checks drawn on its account at Malvern National Bank. The funds for payment of such checks were created by deposits of checks drawn on the Hope Dealership's account at First National Bank of Hope.[10]

In August 1991, Cummins' schemes crashed. On August 7, 1991, Malvern National Bank notified the First National Bank of Hope that the Hope Dealership, the Malvern Dealership and the Jefferson Dealership were involved in an illegal check and draft kiting scheme. The kiting scheme was planned and directed by Cummins and Ingram. As a result of the kiting scheme, the Malvern Dealership and the Hope Dealership borrowed $310,000 from a relative of Hays to cover the outstanding checks of the dealerships.

The kite[11] was structured as follows. In July 22, 1991, the Hope Dealership deposited with First National Bank of Hope five drafts

---

10. Cummins asserts that the transactions simply represented the purchase and sale of automobiles between the dealerships. However, the number of these transactions indicate that the purpose of was to create a false cash flow.

11. "Check kiting consists of drawing checks on an account in one bank and depositing them in an account in a second bank when neither account has sufficient funds to cover the amounts drawn. Just before the checks are returned for payment to the first bank, the kiter covers them

by depositing checks drawn on the account in the second bank. Due to the delay created by the collection of funds by one bank from the other, known as the 'float' time, an artificial balance is created." *United States v. Stone,* 954 F.2d 1187, 1188 n. 1 (6th Cir.1992). *Accord United States v. Kroh,* 896 F.2d 1524, 1527 n. 4 (8th Cir.), *vacated and reh'g en banc granted,* 904 F.2d 450 (8th Cir.), *opinion adopted,* 915 F.2d 326 (8th Cir. 1990).

on 1990 vans for purchase by the Malvern Dealership. The five drafts totaled $71,928.96. First National Bank of Hope gave the Hope Dealership immediate credit on the drafts, and on July 22, 1991, sent the five drafts to Malvern National Bank for presentment to the Malvern Dealership. The Malvern Dealership had previously deposited in its account at Malvern National Bank the Hope Dealership's check number 8437 dated July 19, 1991, which was in the exact amount of the five drafts, $71,928.96. Accordingly, when the five drafts were received by Malvern National Bank for presentment to the Malvern Dealership, the Malvern Dealership was able to pay for the drafts with funds that had been credited to its account because of the deposit of the Hope Dealership's check number 8437. On August 1, 1991, the Hope Dealership deposited with First National Bank of Hope identical drafts for the same five vans. The drafts were once again to be purchased by the Malvern Dealership. However, First National Bank of Hope had been instructed to send the drafts to the Bank of Malvern instead of Malvern National Bank. On July 30, 1991, the Malvern Dealership deposited in its account at Malvern National Bank the Hope Dealership's check number 8559, which once again was in the exact amount of the five drafts, $71,928.96.

The scheme collapsed when Malvern National Bank discovered that a Jefferson Dealership check in the amount of $65,000 drawn on the Jefferson Dealership's account at First National Bank of Jefferson, which had been deposited by the Malvern Dealership in its account at Malvern National Bank, would not clear because of insufficient funds. Malvern National Bank refused to give the Malvern Dealership credit on the Jefferson Dealership check. Malvern National Bank then returned four checks payable by the Malvern Dealership to GMAC and four checks payable by the Malvern Dealership to the Bank of Malvern. The returned checks totaled $117,407.69. Malvern National Bank's return of checks payable to the Bank of Malvern caused the Bank of Malvern to notify

First National Bank of Hope that it was returning the five drafts on the 1990 vans.[12]

### G. Post–Dismissal Conduct

When the kiting scheme was discovered, a meeting was held on August 12, 1991, at which Cummins admitted that he had been kiting.[13] Cummins agreed to refrain from interfering with the financial affairs of the dealerships. By corporate resolution dated August 12, 1991, Cummins relinquished all authority to incur debt or to pledge property on behalf of the dealerships. In addition, Cummins lost any authority to withdraw funds from the dealerships' accounts.

However, two days later, Cummins dismissed John Hays as an employee of the dealerships. On September 3, 1993, Cummins went on a rampage of corporate mischief. He dismissed Craig Afeld as manager of the Hope Dealership, and dismissed Steve Kelley as the manager of the Jefferson Dealership. In addition, Cummins sent each of these men letters threatening criminal prosecution for trespass if they entered the dealership premises. On that date Cummins and Ingram submitted signature cards and corporate resolutions to the First National Bank of Marshall, Texas, in an attempt to obtain control of the Jefferson Dealership's accounts at that bank.

The next day, September 4, 1991, Cummins and Ingram filed a complaint against Hays, John Hays, and Steve Kelley seeking to enjoin their involvement in the operation of the Jefferson Dealership. The Texas Court, on September 10, 1991, subsequently enjoined Cummins and Ingram from entering the premises of the Jefferson dealership or taking any actions on behalf of that dealership. Although the parties agreed that injunction would apply to the Hope and Malvern Dealerships as well, Cummins and Ingram later refused to sign an agreement to that effect.

Instead, on September 13, 1991, at the U.S. Post Office in Hope Arkansas, Cummins demanded access to the postal box for the Hope Dealership. Because of the confusion

---

12. The five drafts for the 1990 vans disappeared. Ingram testified that she gave them to Cummins.

13. Other breaches were not discovered until audits were performed by GM and the corporations' accountants.

engendered by this action, the postmaster denied all persons access to the post box such that the Hope Dealership was unable to obtain any mail until October 4, 1991, when the Chancery Court issued an order in favor of Hays. Cummins' conduct interfered with the business of the dealership, delayed payment to suppliers, and delivery of automobiles to customers, thereby damaging the dealership.

On September 17, 1991, Cummins entered the Malvern Dealership and removed its corporate books and records. On September 18, 1991, Cummins delivered a fraudulent corporation resolution to the Arkansas Bank & Trust Company in Hot Springs, in an attempt to obtain control of the Hope Dealership's account at that bank. On that same date, Malvern National Bank delivered a letter to Hays demanding that the Malvern Dealership and/or Hays, as guarantor, make payment of $236,069.94 to the bank to bring the Malvern Dealership's used car floor-plan loan current and to pay off deficiencies on recourse consumer contracts purchased by Malvern National Bank from the Malvern Dealership. Hays paid that amount out of his personal funds.

### III.

### *THE COMPLAINT*

The complaint states several alternate grounds objecting to Cummins' discharge and the dischargeability of debts owed to the dealership corporations and to Hays, individually.

#### A. *Section 523(a)(2)*

■ Hays, individually, asserts a cause of action under section 523(a)(2). Under the Bankruptcy Code, there are two separate causes of action for fraudulent misrepresentation, contained within section 523(a)(2). Section 523 provides in pertinent part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.* * *

11 U.S.C. § 523(a)(2)(A), (B).

There is some question as to whether both causes of action under section 523(a)(2) were before the Court. Upon a review of the pleadings and the evidence submitted at trial, the Court finds that only a cause of action under section 523(a)(2)(B) was either pleaded or proven. Although Cummins occasionally refers to the action pleaded and proven under section 523(a)(2)(B) as an action under section 523(a)(2)(A), these appear to be typographical errors. Indeed, Cummins' assertion that a section 523(a)(2)(A) was neither pleaded nor tried is one of the few consistent and coherent arguments he has made throughout the litigation. Only the cause of action under section 523(a)(2)(B) is addressed in this opinion.

■ Under this paragraph, plaintiffs must demonstrate that

(1) the debtor made representations regarding the debtor's or an insider's financial condition;

(2) that at the time the debtor made the representations, he knew them to be false;

(3) that the debtor made the representations with the intention and purpose of deceiving the creditor;

(4) that the plaintiffs relied on such representations;

(5) that the plaintiffs reliance upon the representations was reasonable;[14] and

14. In a cause of action under section 523(a)(2)(A), reliance upon the statement need

(6) that the plaintiffs sustained the alleged loss and damage as the proximate result of the representations having been made. *See Thul v. Ophaug*, 827 F.2d 340, 342 & n. 1 (8th Cir.1987).

The plaintiffs argue that as early as January 1, 1990, Cummins knowingly prepared and delivered to Hays and others materially false financial statements for the dealerships to misrepresent the true financial condition and operations of the dealerships. Hays relied on these statements by (1) agreeing to acquire the Jefferson Dealership in January 1991; (2) contributing $100,000 in cash to the Malvern Dealership in January 1991; (3) loaning funds to the debtor in exchange for a note for $171,500; and (4) personally guaranteeing obligations of the dealerships.

The evidence is overwhelming that the debtor made false financial statements, delivered them to Hays, and that Hays relied on the false financial statements. Both Ingram and Cummins testified that it was their practice to put false information into the operating reports before they were delivered to Hays and General Motors. In addition, Ingram specifically stated that it was expected that Hays and General Motors would rely upon these statements.

The difficult issue for the Court under this subparagraph is whether Hays' reliance upon the statements was reasonable. Hays obtained a B.A. degree in 1957 and also graduated from the Stonia Graduate School of Banking at Rutgers University in 1965. His employment has been solely in banking since his graduation, having worked for the First National Bank in Dallas for over three years before moving to Hope, Arkansas where he has been employed by the First National Bank of Hope. He began with that bank as a cashier, later became president, and, since 1991 has been Chairman of the Board.

Although very familiar with balance sheets and other such financial statements, Hays testified that he was unfamiliar with the operating reports Cummins generated monthly on behalf of the dealerships. Indeed, on several occasions, at his request, he would have Cummins come to the bank to explain the reports to him.

The Court finds that, on balance, reliance upon the operating reports to extend credit was not reasonable. The Court cannot believe that a man of Hays' knowledge and experience in banking and lending relied solely upon unfamiliar information to extend credit to Cummins. Hays admits that he was unfamiliar with the reports and often had questions regarding the information contained in them. It is amazing that a person of Hays' business acumen, experience, and position did not seek and/or demand other information familiar to him, or other information to corroborate the data on the reports.

Accordingly, although all other elements of fraud exist, since Hays did not reasonably rely upon the operating reports submitted to him by Cummins, the extension of funds to Cummins cannot be considered a separate nondischargeable debt under section 523.

### B. *Section 523(a)(4)*

1. *The Standards Under Section 523(a)(4)*

▇▇▇ Section 523(a)(4) provides that a debt owed by a debtor is excepted from discharge if there was a defalcation while acting in a fiduciary capacity. The plaintiffs must prove two elements: that the debtor was a fiduciary of the corporations, and that, while a fiduciary, the debtor committed a defalcation. This cause of action relates only to the corporate plaintiffs, not Hays, since there is no authority in Arkansas that a manager owes a fiduciary duty to a shareholder.[15] Rather, the fiduciary duty of an officer, director, and/or manager runs to the corporation.

▇▇▇ Because corporate officers are to be held to a strict standard of fair dealing, if a particular transaction is challenged, a di-

---

not be reasonable. *Thul v. Ophaug (In re Ophaug)*, 827 F.2d 340 (8th Cir.1987) ("[W]e can only conclude that section 523(a)(2)(A) does not require a creditor to prove that his reliance on the debtor's fraudulent misrepresentations was reasonable.").

**15.** Hays must look to the corporations, and other remedies, including his shareholder's derivative suit, to recover the funds he expended on behalf of the corporations.

rector or officer bears the burden of showing that any personal dealing with the corporation is fair, in good faith, and for adequate consideration. *Matter of Candlewood Shores Estates, Inc.*, 20 B.R. 377, 380 (Bankr. D.Conn.1982). In other words, for purposes of discharge exception, once the corporation has met its initial burden of showing the officer's debts to the corporation arose out of a defalcation while the officer was acting in a fiduciary capacity, the burden then shifts to the debtor to prove that his transactions with the corporation were in good faith and inherently fair from the viewpoint of the corporation *or* that he disclosed the facts to all concerned, and the other directors or shareholders assented.

There are two ways of establishing fiduciary capacity under this section of the Bankruptcy Code. Both methods are relevant in this case. The first is by a written agreement between the parties containing language which creates a fiduciary relationship. Mere recitation of the words "trust" or "fiduciary" in a contract cannot change a simple debtor-creditor relationship into a fiduciary relationship. *In re Storms*, 28 B.R. 761, 764 (Bankr.E.D.N.C.1983). Rather, the parties must have truly intended to create a fiduciary relationship. The express terms of the Agreements to Purchase signed by Hays and Cummins imposed a duty upon the shareholders not to "do any act detrimental to the best interest of the corporation or which would make it impossible to carry on the ordinary business of same."

The second context in which a fiduciary relationship under section 523(a)(4) can be established is where there is a clear fiduciary duty on the part of corporate officers to a corporation with regard to the proper treatment of corporate assets over which the corporate officer has control. *In re Long*, 774 F.2d 875 (8th Cir.1985).

Whether a fiduciary duty exists under the second context described above is determined by state law. Arkansas recognizes that a corporate officer is charged with a fiduciary duty to the corporation. *Taylor v. Terry*, 279 Ark. 97, 649 S.W.2d 392 (1983); *Raines v. Toney*, 228 Ark. 1170, 313 S.W.2d 802 (1958). He must not waste the corporate

assets. He must not benefit himself over the other shareholders. There is no dispute that Cummins was an officer of the corporations and hence the first element of proof has been met. Cummins had a fiduciary duty to the corporation.

With respect to the second element, a number of courts and commentators have defined "defalcation." Generally, defalcation is a failure to account for money or property that has been entrusted to one. *In re Long*, 774 F.2d 875, 878 (8th Cir.1985); *Matter of Vickers*, 577 F.2d 683 (10th Cir. 1978). It is broader than fraud, embezzlement or misappropriation. *Hash v. Reed (In re Reed )*, 155 B.R. 169, 172 (Bankr.S.D.Ohio 1993). It can be a mere deficit resulting from the debtor's misconduct, even if he derived no personal gain from the defalcation. *Reed*, 155 B.R. at 172 ("Section 523(a)(4) is concerned with the act of failing to properly deal with entrusted property and not with the identity of the improper recipient of that property."). Thus, the debtor's assertion that he did not personally profit from his actions does not provide a defense to defalcation. It is the slightest misconduct, and it may not involve misconduct at all. Indeed, negligence or ignorance may be defalcation.

The law imposes a high standard of conduct upon an officer or director of a corporation. This imposition is predicated upon the fact that he has voluntarily accepted a position of trust and has assumed control of property of others. Such a person occupies a fiduciary relation to the corporation and may not take action in opposition to the corporation. Further, a president or general manager of a corporation owes a duty not to do any unfair or fraudulent act which will result in private gain at the expense of the corporation. Such an act would be a breach of his fiduciary duty as president or general manager. *Taylor v. Terry*, 279 Ark. 97, 649 S.W.2d 392 (1983).

In determining whether defalcation occurred, an objective test is applied. *Reed*, 155 B.R. at 172. Neither ignorance of the law nor a particular subjective mental state is relevant. *Id.* Thus, the debtor's

asserted motive in projecting a positive image for the corporation does not assist him. His subjective intent to benefit the corporation, does not provide a defense. Moreover, the Court rejects as meritless any defense predicated upon the assertion that other dealership managers employ such practices and methods of business. "Every body does it" is not a defense.

## 2. Evidence of Defalcation

■■■ The issue then before the Court is whether any of the debtor's conduct should disqualify the particular debt from discharge for defalcation while acting in his fiduciary capacity as president and general manager of the plaintiff corporations.

The evidence of Cummins' breach of fiduciary duty to the dealership corporations is overwhelming. The false operating reports sent to General Motors breached the franchise agreements and placed the corporations in jeopardy of losing their franchise with General Motors. Cummins caused the corporations to be involved in illegal schemes with Ronnie Diamond and caused the corporations to operate illegal kiting schemes. Cummins caused the corporations to have false books and records. Each of these acts, together with all of the acts described in Part II, *supra* constitute breaches of fiduciary duty to the corporation such that any and all damages to the corporations arising from Cummins' acts are nondischargeable in this bankruptcy case.

## 3. Cummins' Defenses

■■■ Cummins asserts that the acts were those of the corporations, not himself, the individual debtor, such that no cause of action is stated. Cummins also asserts that the complaint does not allege facts that Cummins stole money, only that the corporations stole money. However, Cummins ignores the language in the complaint which alleges:

> The kiting scheme was planned and directed by the Debtor and Ingram. As a direct result of the kiting scheme, Hays and his family were forced to contribute $310,000 in cash to the Dealerships to cover outstanding checks of the Dealerships which could not clear because of insufficient

funds. Such actions on behalf of the Debtor constitute fraud, defalcation and larceny while acting in a fiduciary capacity within the meaning of 11 U.S.C. § 523(a)(4)."

Complaint, ¶ 23. Since the complaint alleges that Cummins conducted the schemes, a cause of action is stated.

■■■ Cummins asserts that "It is the substance of a transaction, rather that [sic] the labels assigned by the parties, which determines whether there is a fiduciary relationship for bankruptcy proceedings." Since Arkansas has long recognized a rule that a corporate officer is charged with a fiduciary duty to the corporation, *Taylor v. Terry*, 279 Ark. 97, 649 S.W.2d 392 (1983); *Raines v. Toney*, 228 Ark. 1170, 313 S.W.2d 802 (1958), the substance of the position imposes a fiduciary relationship. Indeed, the standard is even higher when the officer and director is also the manager of the corporation. *See Raines*, 313 S.W.2d at 808.

■■■ In a related argument, Cummins argues that the term "fiduciary" applies only to trustees of express trusts, citing *In re Long*, 774 F.2d 875 (8th Cir.1985), but recognizes that state law may create a fiduciary status in an officer of a corporation. *Long*, 774 F.2d at 878. That case also concludes that to the extent state law creates fiduciary status in an officer, section 523(a)(4) can be applied to preclude discharge of a debt. *Id.* ("We recognize that there are cases charging individuals, by virtue of their corporate officer status, with the corporation's fiduciary duties.... To the extent these cases hold that a statute or other state law rule may create fiduciary status in an officer which is cognizable in bankruptcy proceedings, we agree.") (citations omitted). Thus, fiduciary capacity under section 523(a)(4) of the Bankruptcy Code can be established where there is a clear fiduciary duty on the part of corporate officers to a corporation with regard to the proper treatment of corporate assets over which the corporate officer has control. *In re Long*, 774 F.2d 875 (8th Cir.1985).

■■■ Cummins also argues that no fraud existed because his only intent was to obtain money for the dealerships; there was no intent to take money out of the dealerships.

That is, he asserts there was no check-kiting scheme, but merely a mechanism for immediate credit from the banks. He further argues that since he, in effect, arranged a "forced" loan for the dealerships, there were no damages by repayment of the loan, and that, in fact, the dealerships benefited from his scheme such that it is "unseemly" for them to try to recover from Cummins what they paid for their just debts. This argument defies logic and reason.[16] Moreover, the assertion that "immediate credit is the same as a check written on good funds," is simply wrong as a matter of law. *See United States v. Stone,* 954 F.2d 1187 (6th Cir.1992).

First, Cummins ignores the concept of a fiduciary obligation to the corporation. The fiduciary obligation is not only to refrain from personal benefit at the expense of the corporation, but there is also an obligation to ensure that the corporation does not conduct illegal schemes, even for its own benefit. Cummins caused the corporations to conduct illegal acts and caused the corporations to breach the franchise agreements with GM. The bald assertion that the corporation "benefited" from potentially criminal acts does not obviate the illegal nature of the acts or the breach of fiduciary obligations in causing the acts.

### C. *Section 523(a)(6)*

1. *The Standards Under Section 523(a)(6)*

The complaint alleges that after he was removed as controlling person, Cummins took certain tortious actions which injured plaintiffs. Under section 523(a)(6), a debt is not dischargeable if it is "for willful and malicious injury by the debtor to another entity or to the property of another entity."[17] "Willful" means an intentional act and "malicious" means an act done without just cause or excuse. *Roy v. Gravel,* 143 B.R. 825 (W.D.La.1992), *aff'd,* 983 F.2d 1062 (5th Cir. 1993), *cert. denied,* — U.S. ——, 113 S.Ct. 2931, 124 L.Ed.2d 681 (1993); *Reid v. Reid,*

149 B.R. 669, 672 (Bankr.D.Kan.1992). Generally, malice must be demonstrated by evidence that the debtor had knowledge of the creditor's rights and that, with that knowledge, proceeded to take action in violation of those rights. *In re Posta,* 866 F.2d 364, 367 (10th Cir.1989).

2. *Evidence of Wilful and Malicious Injury*

The Court finds that Cummins acted in the following manner to harass and cause injury to the plaintiffs, intentionally, and without just cause or excuse:

(1) Dismissed Afeld as manager of Hope; dismissed Kelly as manager of Jefferson; and threatened Hays, Kelley, and Afeld with criminal prosecution.

(2) Submitted signature cards and corporate resolutions to the bank in Texas to gain control of Jefferson accounts.

(3) Wrongfully filed a complaint in Marion County Texas, seeking injunctive relief against Hays and others.

(4) Breached promises not to interfere with operations of Malvern and Hope dealerships.

(5) Caused the Postmaster to deny access to the Post Office Box for the Hope Dealership, thereby delaying payment to suppliers, and delivery of automobiles to customers.

(6) Removed corporate books and records of the Malvern Dealership.

(7) Delivered a fraudulent corporate resolution of the Hope Dealership to a bank to obtain control of Hope's accounts, causing the dealership to close that account.

(8) Unlawfully reported nineteen bogus auto sales for Hope Dealership to GM to obtain rebate checks, which actions were a breach of the franchise agreement.

(9) Made false cash entries in cash receipts' journals of dealerships to conceal working capital deficiencies.

---

**16.** Likewise, the Court rejects the bald assertion that the "loan" scheme was "instituted at the direction of the banks and Thomas E. Hays, Jr." There is no evidence to support this statement. Indeed, all of the evidence is that Cummins insti-

tuted and directed the schemes described in this opinion.

**17.** "Entity" includes a person. 11 U.S.C. § 101(15).

(10) Charged expenses and losses to used car inventory accounts to conceal operating losses.

(11) Increased the debt of the dealerships and misstated sales in financial statements by selling autos from one dealership to another to create sales and cash.

(12) Caused physical damages by negligent or reckless acts to property of the corporations, specifically, all damages associated with the 1987 Bayliner and 1991 Chevrolet Cavalier. *See* Part IIID, *infra.*

The Court concludes that Cummins, without just cause, took these actions willfully and with malice to intentionally disrupt and harm the business of the dealerships. *Cf. In re Lindsay,* 55 B.R. 569 (Bankr.W.D.Okla. 1985). Under the circumstances, the debts associated with these acts should be exempted from discharge.

### D. *Sections 727(a)(2), (a)(6)*

 The plaintiffs assert two grounds for denial of discharge for Cummins' actions with regard to a Chevrolet Cavalier and a 1987 Bayliner. Plaintiffs assert that the debtor mutilated and concealed both vehicles while they were in his possession such that the discharge should be denied under section 727(a)(2). In addition, plaintiffs assert that Cummins disobeyed a Court Order to return the vehicles to the owners, 11 U.S.C. § 727(a)(6).

It is undisputed that at the time the bankruptcy was filed, Cummins was in possession of both the Chevrolet Cavalier and the 1987 Bayliner. On February 5, 1992, the Court issued an agreed Order granting relief from the stay in which stated in pertinent part:

The Debtor presently has in his possession a 1991 Chevrolet Cavalier, vehicle identification number 1G1JC54G4MJ129643, which is the property of Larry Cummins Chevrolet.... Neither the Debtor nor the Trustee has any interest in or claim to the Chevrolet. * * *

The Debtor presently has in his possession ... a 1987 Bayliner, identification number

BJVC58C5K687, which [is] the property of Cummins Chevrolet & Geo. * * *

IT IS, THEREFORE, ORDERED, CONSIDERED AND ADJUDGED that the automatic stay of 11 U.S.C. § 362 be relaxed as to the property described herein and the Debtor is hereby ordered to return the property to Larry Cummins Chevrolet and Cummins Chevrolet & Geo. *Order,* No. 91–16453F, CMS No. 92–22 (Bankr.W.D.Ark. Feb. 5, 1992).

On February 6, 1992, counsel for dealerships notified debtor's counsel that the dealerships were unable to locate the Cavalier. They requested that debtor be instructed to deliver it on or before noon on Friday, February 7, 1992. Although Cummins' actions in the attempt to repossess the Cavalier are reprehensible, there is insufficient evidence that Cummins wilfully disobeyed an Order of the Court.

On February 10, 1992, an employee of the Malvern Dealership discovered that the Cavalier was parked at Cummins' condominium in Hot Springs, Arkansas. The dealership then dispatched Richard Monroe, with the keys to the vehicle, to repossess the vehicle. Monroe discovered, however, that the vehicle had been re-keyed such that the keys were useless. Cummins then appeared and pointed a gun at Monroe's head and threatened harm.[18] The police were called and Monroe directed to leave the premises. The dealership later found the automobile abandoned on a roadside several miles from Cummins' condominium. Cummins had driven the car with two flat tires, causing damage to the vehicle. On February 11, 1992, Monroe also went to the home of Cummins' parents to repossess the 1987 Bayliner, whereupon he discovered that the Bayliner had no wheels or tires. Cummins' father claimed that the wheels had been stolen.

Section 727(a)(2) provides that a debtor shall not be discharged if he, with the intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody or property under this title, transfers, destroys, or mutilates property of the estate within one

---

**18.** The Court does not believe Cummins' assertions that he did not know that Monroe had been sent by the dealership. Cummins, himself, had often hired Monroe to repossess vehicles on behalf of the dealerships.

**358**

year before the bankruptcy. The creditor has the burden of proof as to each element. The plaintiffs must initially establish the fact that the vehicles were property of the estate.

 Here, the debtor Cummins owned stock in the plaintiff corporations which were the owners of the damaged property. "It is an elementary principle of corporate law that a corporation and its stockholders are separate entities and that the title to corporate property is vested in the corporation and not in the owners of the corporate stock. *Moline Properties, Inc. v. Commissioner,* 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943)." *Sun Towers, Inc. v. Heckler,* 725 F.2d 315, 331 (5th Cir.1984), *cert. denied,* 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984). Ownership of stock in an entity does not make even the corporate entity the debtor's property or property of the debtor's bankruptcy estate. Rather, although a debtor may own stock in a corporation, the property interest of the debtor or the debtor's bankruptcy estate extends only to the intangible personal property rights represented by the stock certificates. The stock certificates are property of the debtor or property of the debtor's bankruptcy estate. *In re Peoples Bankshares, Ltd.,* 68 B.R. 536 (Bankr.N.D.Iowa 1986).

 Further, the debtor is not the owner of any property owned by the corporation. *In re Boitnott,* 4 B.R. 119, 122 (Bankr. W.D.Va.1980) ("[T]he stockholders are not the private and joint owners of [a corporation's] property."); *Red Bud Realty Co. v. South,* 96 Ark. 281, 291, 131 S.W. 340, 344 (1910); *Arkansas Iron and Metal v. First National Bank of Rogers,* 16 Ark.App. 245, 251, 701 S.W.2d 380, 383–84 (Ark.Ct.App. 1985). Accordingly, he cannot be denied a discharge based upon damage to those vehicles under section 727(a)(2).

 Plaintiffs also assert that Cummins knew that he was under an Order of the Court to return the property such that his failure to comply constitutes grounds for denial of discharge under section 727(a)(6). Section 727(a)(6) provides in pertinent part:

(a) The court shall grant the debtor a discharge, unless—

(6) the debtor has refused, in the case—

(A) to obey any lawful order of the court, other than an order to respond to a material question or to testify * * *

The term "refused" in the statute indicates that the failure to act must have been willful and intentional. Thus, in order to support a denial of discharge, Cummins must have not only failed to obey an order of the court, but also that failure must have been a wilful and intentional disobedience. *In re Kokoszka,* 479 F.2d 990 (2d Cir.1973), *aff'd,* 417 U.S. 642, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974). In the instant case, the Order directing debtor to return the vehicle was not entered, and thus not even mailed, until February 5, 1992, a Wednesday. The attempted repossession occurred on the following Monday, February 10, 1992. There is insufficient evidence before the Court that Cummins knew that the Order directing him to act had been signed and entered such that his actions, reprehensible as they were, merit denial of the discharge.

 The Order, the result of an agreement by the parties, was submitted by the parties for the Court's signature.[19] Since the Order was a result of settlement, it is clear that Cummins knew he would be required to return the vehicles. Of course, a court is free to disbelieve a debtor's testimony that he never saw a particular order and may deny discharge based upon disobedience to that order. *See In re Dowell,* 82 B.R. 998, 1004 (Bankr.W.D.Mo.1987). Given the short time frame combined with the lack of evidence that debtor knew the Order had been

19. Since Cummins' counsel approved the Order directing the action, he cannot now assert that the Order was "unlawful." Indeed, there is no evidence before the Court to support Cummins very belated assertion that the Order was in any manner "unlawful" or unenforceable. A motion for relief from stay is not, in itself, a separate adversary proceeding. Moreover, an Order granting relief from stay may direct particular action in order that the order granting such relief may be properly effected. In this case, the Order granting relief from stay directed the debtor to return the vehicle. Since the Order was an agreement between the parties, the remedy was appropriate under the Bankruptcy Code and within the core jurisdiction of the Court. No separate action for replevin was necessary or implied by the motion for relief from stay.

entered,[20] however, the Court does not believe that a discharge should be denied under section 727(a)(6).

### E. *727(a)(3)*

Plaintiffs assert that the debtor failed to keep adequate records by which the Cummins' financial transactions could be ascertained such that his discharge should be denied. The basis of this section 727(a)(3) action is the lack of records regarding J & J Advertising. Section 727(a)(3) provides that discharge shall be denied if:

> (a) The debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

Under section 727(a)(3), the debtor is required "to take such steps as ordinary fair dealing and common caution dictate to enable the creditors to learn what he did with his estate." *Koufman v. Sheinwald,* 83 F.2d 977 (1st Cir.1936). Once a plaintiff makes a *prima facie* case, the burden shifts to the debtor to justify why the particular record was not maintained.

The factors to be analyzed in determining whether discharge should be denied under sections 727(a)(3) include the debtor's education, sophistication, business experience, the size and complexity of debtor's business, the debtor's personal financial structure, and any special circumstances that may exist. The Bankruptcy Code does not dictate rigid standards in keeping records. Rather, the decision should be made on a case-by-case basis. *Walton v. AG Credit, ACA (In re Walton),* 158 B.R. 948, 952 (Bankr.N.D.Ohio 1993). Records are adequate only if the trustee and/or creditors can track debtor's financial dealings for a reasonable period. *See Olson v. Potter (In re Pot-*

*ter),* 88 B.R. 843 (Bankr.N.D.Ill.1988). It is the debtor's burden to justify failure to keep adequate records. Moreover, the duty extends not only to all material business transactions of the debtor, but also in appropriate circumstances, pertains to transactions regarding another's property. *Walton,* 158 B.R. at 952.

In the instant case, there are few, if any, records regarding J & J Advertising, purportedly a sole proprietorship operated by Cummins. The auditor for the dealerships testified that invoices were not in any kind of file system, and that statements to the dealerships were incomplete. Moreover, she was unable to match invoices to payments. Indeed, in some cases, there were no invoices in the J & J files that she could match with payments. There were instances in which invoices were paid more than once by J & J, and invoices that were billed more than once to the dealerships, which the dealerships paid more than once. While there were sufficient records to indicate that further investigation was necessary, the records were so incomplete that the investigation could not be completed, nor a true picture of the debtor's financial transactions obtained.

The records were so incomplete, the debtor was unable to testify at the Rule 2004 examination into what accounts funds were deposited or withdrawn. The debtor had worked his entire career in the car dealership business. He was familiar with the management and operations of such business, was sufficiently sophisticated to alter the particular documents to present a particular financial picture of the dealerships, had established a separate business to profit from the marketing of the dealerships, but yet maintained few of the records of that particular "business."

As an alternate and additional ground for the finding that the debtor failed to keep his own adequate business records, the debtor failed to maintain, or destroyed, documents of the corporations with respect

---

20. Under the local rules of this Court, persons submitting orders for Court signature are required to list the name and address of each person to receive a copy of the Order. Rule 3, Local Rules of the United States Bankruptcy Judges for the Eastern and Western Districts of Arkansas. The only names and addresses appearing on the Order in this case are those of the attorneys. Thus, there is no evidence that a copy of the Order was mailed directly to the debtor.

to which he had a fiduciary obligation. The evidence of missing documentation is overwhelming and astonishing. For example, supporting documentation for the general ledgers was missing. While there were schedules of notes receivables, only two of the twenty promissory notes were found; when the payors failed to remit their payments, the notes had to be written off because there was no means to enforce payment. Of course, the Pat High note, *see* Part II(F)(1) was never found. When the accountants attempted to audit the dealerships, they were unable to complete an audit of the Malvern Dealership because crucial documents were missing. The corporate minute book for that dealership was never found.

Testimony at trial indicated that the missing documents had been taken by Larry Cummins. Further, particular ·documents relating to the fraudulent check-kiting scheme disappeared, having last been seen in Cummins' possession. Documentation regarding financial transactions between Cummins and the dealership are incomplete. In these particular circumstances, it is appropriate to apply section 727(a)(3) to the inadequate books and records of the corporations. Without those documents, neither the auditors nor the Court can fully ascertain the debtor's financial transactions. *See Office of Comptroller General of the Republic of Bolivia v. Tractman,* 107 B.R. 24 (S.D.N.Y. 1989).

 Not only are the records inadequate to support a discharge in bankruptcy, the purpose of the section requires denial of a discharge. The purpose of the requirement that a debtor keep adequate records is to preserve fair dealing by making the right to a discharge dependent upon his ability to account for his financial condition. *In re Zell,* 108 B.R. 615 (Bankr.S.D.Ohio 1989). The record is replete with financial questions to which Cummins has no answers, not only because he does not wish to acknowledge his fraudulent behavior, but also because he has insufficient records to assist his recall or assist others in determining what those

transactions were. Cummins neither offered, nor does there appear to exist, any credible justification for failure to preserve his records. Accordingly, his discharge in this bankruptcy case should be denied.

### F. 727(a)(4): False Oath

 The complaint alleges that the debtor made numerous false oaths at a Rule 2004 examination held on January 16, 1992. For purposes of this adversary proceeding, the Court addresses only those false oaths specifically pleaded in the complaint filed on March 11, 1992.[21] The complaint alleges that Cummins made the following false oaths:

(1) Cummins falsely denied that the dealerships had given discounts to persons in exchange for that person providing the debtor with a service or a product;

(2) Cummins falsely denied depositing checks from Good Times Van Company into his personal account;

(3) Cummins falsely stated that Craig Afeld, the manager of the Hope Dealership, was responsible for making improper charges to a repossessed car account for a 1987 Chevrolet Caprice;

(4) Cummins falsely stated that loans from Bruce Gotwald should have been paid by the Dealerships from funds coming in from GM;

(5) Cummins falsely stated that the cashier of the Malvern Dealership was solely responsible for Hope's attempt to obtain funds by the submission of duplicate drafts to the First National Bank of Malvern and the Bank of Malvern.

 Under section 727(a)(4), a debtor's discharge may be denied if he:

knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account. * * *

False testimony given in connection with the case constitutes a false oath. The false oath must be material, *i.e.,* must bear a relationship to debtor's business transactions or estate, or concern discovery of assets, business

---

**21.** The plaintiffs' proposed findings of fact included other statements alleged to constitute false oaths. During trial, the Court sustained objections to testimony of false oaths which were not specifically pleaded.

dealings, or existence and disposition of property. *Mertz v. Rott,* 955 F.2d 596 (8th Cir.1992); *In re Olson,* 916 F.2d 481, 484 (8th Cir.1990) ("The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." (quoting *Chalik v. Moorefield,* 748 F.2d 616, 618 (11th Cir.1984))). There is no doubt that the questions posed related, materially, to Cummins' business transactions or disposition of property.

■ The difficulty with Cummins' responses, however, is that many of them were merely vague, ambiguous or evasive. Thus, there is a question as to whether they were sufficiently untruthful to fall within the statute. For example, in response to questions regarding the Pat High transaction, Part II, *supra,* Cummins responded in the following manner:

> Mr. Rose: * * * Did the Dealerships give any discounts to any body in exchange for that person providing you with a service or a product, you personally?
>
> Cummins: Not that I'm aware of; possibly.
>
> Mr. Rose: But you are not aware of any?
>
> Cummins: No.
>
> Mr. Rose: You don't recall any?
>
> Cummins: Could have been.
>
> Mr. Rose: If there have been, you would have known about it or you would have approved it?
>
> Cummins: Possibly. It's hard to say what I would do, you know.

Exhibit No. 142, pp. 32–34. While the debtor has an absolute duty to truthfully disclose all pertinent information, the testimony regarding the first, second, and fourth issues listed do not constitute "false oaths" within the meaning of section 727(a)(4).

■ The testimony regarding the third and fifth issues, above, however, are statements constituting false oaths, made in the case, such that discharge should be denied under section 727(a)(4). At the Rule 2004 examination held on January 16, 1992, the debtor stated that a cashier at the Malvern Dealership was responsible for the duplicate drafts submitted to the First National Bank of Malvern and the Bank of Malvern. Cummins further denied knowing anything about the transaction. All of the credible evidence shows this testimony to be false. In fact, the evidence before the Court is that Cummins not only knew of the illegal transactions, he planned and directed them.

■ Secondly, Cummins falsely testified that Craig Afeld was responsible for making improper charges to a repossessed car account for a 1987 Chevrolet Caprice, *see* Part II, *supra,* and implied that he was unaware of the charges made. Cummins stated at the examination that he "never saw" the entries. The Court finds this to be a false statement. Moreover, to the extent that Cummins attempts to imply that he was unaware of the charges, that too, is false. Even Ingram testified that Cummins was fully aware of these false charges.

### G. *727(a)(5) Failure to Explain Loss of Assets*

■ Plaintiffs assert that Cummins' discharge should be denied, pursuant to section 727(a)(5) because Cummins failed to explain satisfactorily the diminution of the value of his forty-nine percent interest in the three dealerships. Plaintiffs assert that the stock was devalued due to the debtor's conduct over which he refuses to accept responsibility. The Court finds that, as a matter of law, this assertion fails to state a claim for which relief can be granted. As discussed above, ownership of stock in an entity does not make the corporate entity the debtor's property or property of the estate. Since debtor is not the owner of any property owned by the corporation, *In re Boitnott,* 4 B.R. 119, 122 (Bankr.W.D.Va.1980), he will not be held to account for the value in the diminution of the corporation or the corporate assets.

## IV.

### *CONCLUSION*

Based upon the Foregoing, the Court finds as follows:

1. The debtor's discharge should be denied pursuant to 11 U.S.C. § 727(a)(3), (a)(4).

2. The debts owed by the debtor Larry D. Cummins, only as to the plaintiff corporations, Larry Cummins Chevrolet, Inc., Cummins Chevrolet & Geo, Inc. and Coke Chevrolet Company, are also nondischargeable pursuant to 11 U.S.C. § 523(a)(4), (a)(6).

A separate Judgment will be entered according to these findings.

**It is So Ordered.**